# TRADE SHOW AGREEMENT
## *ORLANDO, CENTRAL AND NORTHERN, FLORIDA*

This Agreement is made and entered into by and between **Global Experience Specialists**, a General Service Contractor, hereinafter referred to as the Company, and the International Alliance of Theatrical Stage Employees and Moving Picture Technicians, Artists and Allied Crafts of the United States, Its Territories and Canada, AFL-CIO, CLC and the jurisdictions of Local Unions 835 *(Orlando-Cape Canaveral Cocoa-Melbourne-Lake Buena Vista-Daytona Beach)*, 60 *(Panama City-Pensacola)*, 115 *(Jacksonville-Tallahassee-Gainesville-Valdosta-Brunswick)*, 321 *(Tampa-St. Petersburg)*, and 412 *(Sarasota)*, hereinafter referred to as the Union.

A General Service Contractor is a company which routinely and primarily provides all services to exhibition management, as well as exhibitors.

## ARTICLE 1 - RECOGNITION

1.01    The Company recognizes the Union as the sole and exclusive collective bargaining agent for those workers covered under this Agreement and agrees not to enter into any agreement or contract with its workers individually or collectively which in any way conflicts with the terms and provisions of this Agreement.

## ARTICLE 2 - SCOPE OF AGREEMENT

2.01    The Company agrees that the handling and placing of pipe, bases, drape, tables, table draping, erecting or dismantling display booths and/or exhibits, modular systems, pegboards, tack boards, drape hung or rigged, carpeting, furniture, platforms, I.D. signs within booth, floor marking, waste baskets, aisle banners, signage, table risers and Association work as it pertains to the scope of this Agreement shall come under the jurisdiction of the Union. Rolling of aisle carpeting at the close of a show is not limited solely to those workers covered under this Agreement.

The Company further agrees that whenever it is in need of persons to perform the functions above, it will telephone or otherwise contact the appropriate Local Union and request such persons. The Union agrees, upon request of the Company, to furnish the Company with a sufficient number of qualified workers to meet its requirements on a non-discriminatory basis.

2.02    This Agreement does not extend to transportation or warehouse handling of freight and empties.

2.03    This Agreement does not prohibit the assignment of thirty-five (35) full-time Company employees to do any work in the exposition field. Should more than five (5) of said individuals be required on any call, the Company will request three (3) workers from the Union for each of the additional Company employees desired on the call up to a maximum of thirty-five (35). The definition of a full-time Company

employee is one that regularly works at least forty (40) hours in one week for the General Service Contractor signatory to this Agreement.

2.04    Full-time employees of exhibiting companies will be allowed to work on the erection and display of their own exhibits, provided they are eligible to work in the USA.

## ARTICLE 3 - MANAGEMENT RIGHTS

3.01    Except to the extent expressly abridged by a specific provision of this Agreement, the Company exclusively reserves and retains all of its inherent rights to manage the business, as such rights existed prior to the execution of this, or any other previously executed agreement.

3.02    It is agreed that the Company alone shall have the authority to determine and direct the policies, modes and methods of operating in the business without interference by the Union. Without limiting the generality of the foregoing, the sole and exclusive rights of management which are not abridged by this Agreement include, but are not limited or confined to, the right to determine, and from time to time re-determine, the number, locations and types of its operations, including the right to move or close its business or any part thereof; to determine the methods, materials and processes to be employed; to discontinue or automate processes or operations; to subcontract any part of its operations except for the purpose of evading its obligations under this Agreement; to determine the qualifications for its employees; to determine the size and composition of its working force; to determine work schedules and methods of performing such work; to determine the number and type of equipment, machinery, materials, products and supplies to be used or operated; to reprimand, discharge, or otherwise discipline employees, for just cause in accordance with this Agreement; to determine or re-determine job content, establish work standards, and control the amount and type of work to be performed; to determine the assignment of work; to schedule the hours and days to be worked on each job; to expand, reduce, alter, combine, transfer, assign or cease any job, or operation; to make or change Company rules, policies and practices; to introduce new, different and improved methods, means and processes or work, methods of service and operation; and otherwise generally to manage the business and direct the work force as the Company, in its direction, deems appropriate.

3.03    The Company's failure to exercise any function or right hereby reserved to it, or its exercise of any function or right in a particular way, shall not be deemed a waiver of its authority to exercise such right or function, nor preclude the Company from exercising the same in some other way not in conflict with the express provisions of this Agreement.

## ARTICLE 4 - TOOLS AND SUPPLIES

4.01    Each worker referred to the Company by the Union shall have in their possession functional tools to accomplish their assigned duties. The tools shall consist of at least, but not limited to:

| **Journeymen** | **New Hires** |
| --- | --- |
| a.  Hammer | |
| b.  Screwdriver | b.  Screwdriver |
| c.  Pliers | c.  Pliers |
| d.  Crescent Wrench | d.  Crescent Wrench |
| e.  Staple Gun (Arrow JT-21) | e.  Staple Gun (Arrow JT-21) |
| f.  Phillips Screwdriver | f.  Phillips Screwdriver |
| g.  Utility Knife, may be, razor knife, etc. | g.  Utility Knife, razor knife, etc. |
| h.  Tape Measure (25' min.) | h.  Tape Measure (25' min.) |
| i.  Top carpet cutter | |
| j.  Loop pile carpet cutter | |
| k.  Pry bar | |
| l.  Wire cutters (Diagonal) | |
| m.  One set each standard & metric Allen wrenches | m.  One set each standard and metric Allen wrenches |
| n.  ¼" ratchet set, 5mm tip and Torx 30 tip (star key) | n.  ¼" ratchet set, 5mm tip and Torx 30 tip (star key) |
| o.  Tool belt or apron | o.  Tool belt or apron |
| p.  Battery operated screw gun (12 volts or higher and tips) | |
| q.  Ballpoint pen | q.  Ballpoint pen |

4.02    Any worker referred to the Company without appropriate tools shall thereby waive any rights to minimum call time.

4.03    Any Company tool assigned to a Union referral shall be signed out and returned by that worker.

## ARTICLE 5 - LABOR MANAGEMENT COMMITTEE

5.01    In order to promote the welfare of the Industry, encourage labor/management cooperation and provide a forum for labor and management to resolve problems, discuss opportunities and project staffing needs: a Labor Management Committee (LMC) consisting of equal numbers of representatives from the Union and the Company will be installed immediately. The purpose of the LMC will be set forth in this Agreement and as may be mutually agreed to in the future by the Union and the Company. The LMC will not meet less than once every calendar quarter. Additionally, special meetings may be called, as mutually agreed upon.

## ARTICLE 6 - STRIKES AND LOCKOUTS

6.01    There shall be no lockout by the Company during the term of this Agreement.

6.02    The Union agrees that there will be no strikes, slowdowns, or work stoppages for any reason, including in sympathy with others, during the life of this agreement; provided, however, that employees shall have the right to respect any lawful picket line.

## ARTICLE 7 - DUES CHECK-OFF & PAC CHECK-OFF

7.01    The Company agrees to check-off Union membership dues consisting of monthly dues, initiation fees or assessments for all personnel referred by the Union covered by this Agreement, provided the Union has obtained a written authorization signed by the referred personnel which satisfies applicable Federal and State regulations.

7.011   Withheld dues, fees or assessments will be paid by check made payable to the appropriate local union no later than the 15th day of each month in respect to all withholdings during the preceding month. Interest at the rate of 1 ½ % per month compounded monthly from the due date shall be payable on all late payments of withheld dues, fees or assessments.

7.02    The Union shall indemnify and save the Company harmless against any and all claims, demands, suits, and other forms of liability that may arise out of, or by reason of, action taken by a worker referred by the Union or a Union member covered by this Agreement under this Article.

7.03    Voluntary Political Contributions.  The Employer agrees to deduct from each employee's gross wages at each payroll period such voluntary contributions to the IATSE Political Action Committee (IATSEPAC) as the employee has authorized in writing to be deducted.  At least once a month, the Employer will issue a single check for such deductions payable to IATSEPAC care of the Union.

7.031   Employees who wish to cancel their deduction will sign a card supplied by the Union for such purpose.  Refunds will be the responsibility of the Union.

7.032   The Union will indemnify and hold harmless the Employer from any and all liability arising from the deductions provided for in this Agreement.

## ARTICLE 8 - GRIEVANCE PROCEDURE

8.01     Should any grievance, complaint, or dispute arise involving the application, interpretation, or alleged violation of any provision of this Agreement, the matter shall be resolved as follows:

### Step 1. - Problem Solving

8.02     The complaining party shall, no later than three (3) calendar days from the date the grievance or dispute occurred or come to his/her attention, bring the grievance or dispute to the attention of the Job Steward. The Job Steward shall first attempt to settle the controversy with the Production Supervisor, who shall give the Job Steward an oral reply within three (3) calendar days. The Job Steward shall report his findings to the grievant and the Union within two (2) calendar days of receiving the oral reply. It is understood that this process will be conducted under the following conditions: 1.) The dispute or disagreement shall immediately be removed from the show floor; 2.) The issue(s) shall be discussed in a less visible location in an attempt to resolve the issue(s); 3.) Verbal and/or physical confrontations will not be tolerated and could be subjected to appropriate action. Settlement of a grievance at this level does not set precedent or policy.

### Step 2.

8.03     If the grievance is not settled in the manner provided for in Step 1, the grievant may, within five (5) calendar days of receipt of the oral reply, file with the Union a signed written grievance. Such written grievance shall contain the following information with reasonable clarity; the exact nature of the grievance, the act or acts complained of; by who they were committed and why they occurred, and the specific provision or provisions of this Agreement which the Company has violated.

8.04     Should the Union determine that the grievance has merit, it shall file the grievance with the Company's General Manager within ten (10) calendar days of receipt of the written grievance. The Company's General Manager will give his answer, in writing, to the Union within ten (10) calendar days of the date it was presented to him/her. In the event the Company does not answer a grievance within the prescribed time limits above, the Union may proceed immediately to the next step.

### Step 3.

8.05     If the grievance is not settled in Step 2 the grievance may be advanced to a hearing between a designated International Representative of the IATSE and the General Manager or other designee of the employer. The grievance must be appealed to this level within ten (10) calendar days of receipt of the written reply at step Two (2). If resolved at this level, the settlement shall be final and binding upon the parties. If unresolved at this level either party may within ten calendar (10) days submit the grievance to arbitration.

11.023     <u>New Hire:</u> Must be at least 18 years old, able to work in the United States, and must be able, for safety purposes, to understand the employers oral and written instructions and directions.

11.03     <u>Request By Name:</u> The Employer shall have the right to request by name up to 50% of the call from the Union's Journeyman and Helper referral lists. Priority employees shall be counted as requested employees for the purpose of determining 50% of the call; however, this shall not prohibit the Employer from using Priorities in excess of 50% of the call. The Employer may submit a request list equal to 50% of the call. The Employer may also submit an alternate request list equal to 50% of the call. Requested employees will be dispatched in the order requested by the Employer, to the location requested by the Employer and at the time requested by the Employer. The Employer may contact its Leads directly, as priorities are currently contacted, and will notify the Union of its confirmed Leads as soon as practicable.

11.031     On the first two days of move-in, the Employer shall have the right to request by name up to 100% of the call from the Union's Journeyman and Helper referral lists only as far as the total labor call does not exceed 50% of the highest day of the move in. A move-in day that only involves a floor marking crew shall not count as the first day of move-in for the purposes of this section. If any work is performed in addition to floor marking, then floor marking day shall count as the first day of move-in for purposes of this section.

11.032     On the third day of move-in, and every successive day, the Union shall have 100% of the call until parity is reached. Once parity is reached, the call shall be on a 50/50 basis for the remainder of the show. For example, if the call the first two days is for 50 employees, the Employer shall select all 50 employees. On the third day, a call of an additional 25 employees will be entirely selected by the Union. On the fourth day, an additional call of 75 will be 25 selections by the Employer, and 50 selections by the Union. After that point, each call will be split equally between the Union and the Employer for the remainder of the show.

11.04     <u>Job Roster:</u>    Employees shall be listed on the job roster as follows beginning with day one of a call:
1.     Department Leads
2.     Priorities
3.     Leads
4.     Requested Journeymen
5.     Non-requested Journeymen
6.     Requested Helpers
7.     Helpers
8.     New Hires

11.041     The Job Steward is the last person cut from any call.

11.042     Cuts and layoffs will be made on the basis of skills required to complete the work to be done as determined by the Employer, with input from the Steward. If the Employer

year. Employees more than thirty minutes late may be sent home without pay at the Company's discretion.

11.122    The Union and the employee will receive notice of all points that are assessed. The Union will have 10 calendar days to file an objection clearly stating the reason therefore. Such point assessments shall become final should the Union not file objections within this 10 day period.

11.13     The Company may elect to establish a priority call list of Journeymen from within the local union's jurisdiction. During the term of this agreement, the Company will reduce the number of priorities by five (5) per year until the maximum number on the list is fifteen (15). Designated priorities must have at least two years' experience with the local union. The Company will directly notify priority employees for any work covered by this Agreement.

11.131    Priority employees will be given preference of employment and are subject to layoff and recall depending on the availability of work. Priority employees may be removed from the Priority list by the Company for just cause.

11.132    Priority employees may be transferred from job site to job site and from show to show at the Employer's discretion without separate four-hour minimum calls. If transfer is in the same day the Employer will pay travel time and Priority employees will be paid an eight-hour minimum for the day.

11.133    The Employer will provide the Union with a list of Priority employees. The Employer will notify Priority employees directly regarding work assignments. The Employer will provide the Union with written notification of Priority employees' work schedules and work locations.

11.14     The Company shall designate Leads from the Union's Journeyman lists. The Union shall designate Stewards.

11.15     There shall be a working Steward on all original and repeat calls.  The Steward shall be permitted a reasonable amount of time to service the contract. If the call is for one hundred and fifty (150) or more persons, the Union shall be entitled to appoint a second working Steward.

11.151    The Job Steward will assist in the routine assignment of work crews for each job and shall serve as time keepers if requested to do so by the employer.

11.152    A copy of the time sheets will be provided to the Job Steward each day.

11.153    Employees will receive a time card or receipt for all hours worked at the end of each day.

11.16     The Steward shall receive one-half (1/2) hour pay at the prevailing hourly rate for calls of thirty (30) or more before and/or after the shift in order to perform necessary

paperwork. If the Steward is required to report to the Employer prior to the job call reporting time, the Employer shall notify the Union in advance. If the one-half (1/2) hour does not apply, the Employer shall provide the Steward the necessary time to complete the paperwork within the framework of the call.

11.17   Employees are required to work overtime as long as overtime is not discriminatory. Employees not complying may be subject to disciplinary action.

11.18   Journeyman shall be capable of performing all phases of bargaining unit work and may be assigned as per employer needs.

## ARTICLE 12 - WORK ASSIGNMENT AND OVERTIME

### A.  Conventions and Trade Shows

12.01   Hours worked in excess of eight (8) in one work day, in excess of forty (40) in one work week, on Saturday & Sunday, and between the hours of 9:00 p.m. and 6:00 a.m. shall be paid at one and one-half (1-1/2) times the worker's straight time hourly rate.

12.02   Holidays and all hours worked in excess of fourteen (14) in one work day, will be paid at two (2) times the worker's straight time hourly rate.

There shall be no duplication or pyramiding of overtime premiums for the same hours
12.03   worked.

## ARTICLE 13 - WORKING CONDITIONS

13.01   It is the intent of the parties hereto to allow a worker a minimum of eight (8) hours rest between the time a worker ends their work with the Company and the time he begins work on a repeat call for the same job, placed by the Company. Therefore, the Union shall not refer to the Company any worker it knows shall not have the time from the completion of work for the Company to the beginning of the Company's next call to acquire the eight (8) hours rest. Further, the Company reserves the right to reject, without penalty, any worker referred by the Union who the Company knows will work prior to the completion of the eight (8) hour rest period. In the unlikely event the Company requests a person to return to work before the they have had eight (8) hours of rest, the Company shall pay them the prevailing rate per hour as determined at the time they were cut, plus one-half hour of straight time, not to exceed double time and one-half (2.5); all such time will be considered continuous in the application of overtime and premium conditions until those affected have received eight (8) hours of rest. The Company reserves the right to change the subsequent day's starting time for workers it knows will not meet the minimum rest period hours. A set-up and dismantle of a job in a twenty-four (24) hour period does not constitute a turn-around penalty. The Employer shall not be required to apply this section to employees who have removed themselves from the call prior to being released by the employer.

13.011   The provisions of Section 13.01 notwithstanding, turn-around time will not be paid if the invasion of turn around hours is due to the Union's inability to fill at least 85% of a labor call received with a 96-hour notice.

13.02   There shall be one fifteen (15) minute break every two (2) hours; except, on calls of five (5) hours or less, there will only be one fifteen (15) minute break midway through the call.

13.03   A worker shall receive an unpaid meal period of one-half (1/2) hour to begin after the end of the third (3rd) and prior to the start of the seventh (7th) hour after starting work. The unpaid meal period may be increased to one hour at the Company's discretion. A worker who does not receive a meal period after six (6) continuous hours of work will be subject to further provisions outlined in 016this Article. A worker who is held for work after the meal period shall be guaranteed two (2) additional hours of work. If the meal period is taken after the third (3rd) hour a three (3) hour minimum does apply after that break.  Employees will be assigned and directed to take a meal period by a Company Supervisor.

13.04   In the event that an employee is not permitted a meal period, the Company shall pay such employee the hourly rate prevailing at the time a meal period should have been given plus one (1) hour straight time per hour as a meal penalty. The meal penalty shall continue until such employee is given a meal period after which point the rate of pay will revert to the employee's prevailing hourly rate.

13.05   An employee who works a work day of six (6) or less hours shall not be eligible for a meal period.

13.06   The Company shall be solely responsible for determining the rest and meal schedules for each worker. The steward will make a reasonable effort to notify the Company Supervisor in the event of any pending meal or rest period penalty.

13.07   Any employee may be transferred from the initial location to another location while working on a call for the same Association, Convention, or Trade Show within reasonable walking distance on the same call. On greater distances, the Company will provide transportation (not in the back of a truck), providing that the transfer is for the sole purpose for the same job and must be the same job as originally called in for.

13.08   All work calls will be a four (4) hour minimum call per job.

13.081   Shift work is permitted when mutually agreed between the Company and the Union.

13.09   A "Miscellaneous Job Call" will be created, which will allow the Company to transfer workers between various job sites on one (1) day on a five (5) hour minimum call.

13.10   Definition of "Miscellaneous Job Call" - Various temporary jobs (excluding trade shows) requiring a maximum of four (4) workers who will be transferred from job

site to job site during a one (1) day period, i.e., screen masking, hanging of drapes, hanging of banners and signs, delivery of furniture, etc.

13.11      The Company may, where it feels a worker's job performance to be unacceptable, notify the Steward citing the specific complaint(s) and the Steward shall immediately warn the worker of the Company's complaint. Any worker so warned shall be considered on "probation" for the remainder of the call and should the Company have justifiable cause to complain of that worker again during that call the Steward shall dismiss such worker from the call. The Company must submit, in writing, the specific complaint(s) against such worker and such written complaint shall be delivered to the Steward on the call prior to the end of the work day on which such dismissal occurred.

13.111     The Company reserves the right to notify the Union of the name of any worker it does not wish to utilize in its work due to unacceptable job performance, and the Union agrees that it shall not refer such named worker to the Company. Such request by the Company shall be placed in writing with an explanation as to the reasons why.  Each case of this type may be reviewed after one year.

13.12      No gratuities or merchandise shall be solicited and/or accepted regardless of whether said gratuity or merchandise be in money or any other consideration. Employees who violate this prohibition will be subject to discipline, including discharge. There will be no "shopping" for exhibitor merchandise while on the company's work call. The Company shall have the sole authority to determine the disposition of materials left behind in exhibitors' booths, etc. No Union referral will remove any merchandise from the show floor.

13.13      Employees shall not be permitted to use portable/cell phones, Bluetooth or similar devices while actively employed except during rest breaks or meal breaks. This section shall not apply to Primary/Assigned Job Stewards or Union representatives. Employees shall not be permitted to use Walkman radios, CD players, MP3 players or similar devices while actively employed except during rest breaks or meal breaks. It is understood by all parties that employees who are using an electronic device (including cell phones and Bluetooth type devices) while driving any vehicle (including but not limited to forklifts, flatbeds and scooters) shall be subject to discipline, up to and including immediate termination.

13.14      The Employer may immediately terminate an employee for any of the following reasons:

   1. Possession of any weapon, other than a tool of the trade, on any jobsite or on any Company premises, including parking lots, or violence or threats of violence toward another person except reasonable self-defense.
   2. Dishonesty, including but not limited to stealing/theft, falsification of documents, or the unauthorized use, removal or possession of property not belonging to the employee.

3. Refusal of a job assignment, including but not limited to leaving jobsite and/or assignment without authorization or quitting in response to an assignment.
4. Harassing or abusive language or behavior toward another person.
5. Loss, revocation of driver's license for employees who drive as part of their job duties. Loss, revocation are defined as per State laws, and the Employer must be notified by employee of any pending action.
6. Solicitation of, or acceptance of any gratuity from any person.
7. Shopping, purchasing any item on the show floor or removing any item from the show floor except as part of their job duties.
8. Willfully or negligently misusing, destroying or damaging any property of the Employer, show management, exhibitor or convention facility.
9. Work done in competition with the Employer while employed by the Employer.
10. Conviction of a felony involving assault, theft, terrorist activity, or any other felony that adversely affects employment.

This list is provided as an example of the types of behavior that will result in immediate termination and is not meant to be exhaustive.

## ARTICLE 14 - HOLIDAY WORK

14.01    Employees shall be paid two times (2) the regular straight time hourly rate for all work performed on the following legal holidays, as observed by the Federal Government:

| | | |
|---|---|---|
| New Year's Day | Independence Day | Christmas Eve |
| Martin Luther King Day | Labor Day | Christmas Day |
| Memorial Day | Thanksgiving Day | |

## ARTICLE 15 - HEALTH & WELFARE, PENSION, ANNUITY AND TRAINING

15.01    The Employer agrees to contribute the following percentage of gross wages earned by all Journeyman employees to the IATSE National Health and Welfare Fund, The IATSE National Pension Fund, the IATSE Annuity Fund, and the IATSE Entertainment and Exhibition Industries Training Trust Fund.

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| H&W | 22% | 22% | 22% | 22% | 22% |
| Pension | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Annuity | 6.6% | 6.6% | 6.6% | 6.6% | 6.6% |
| IA Training | .5% | .5% | .5% | .5% | .5% |

15.011   In conjunction with each contribution, the Employer shall submit a remittance report showing the names of the employees for whom contributions are being made,

their social security numbers, their dates of employment, and the number of hours of employment by them as well as the amount of contributions paid for them.

15.012   All contributions to the IATSE National Health and Welfare Fund, National Annuity Fund and the National Pension Fund shall be made by check payable to the "IATSE National Benefit Funds", no later than the 10th day of each month in respect to all employment during the preceding month on which contributions were payable. Benefit contributions shall be sent to the IATSE National Benefit Funds, P.O. Box 11944 Newark, NJ 07101- 4944.

15.013   All contributions to the IATSE Entertainment and Exhibition Industries Training Trust Fund shall be made by check payable to the "IATSE Training Trust Fund", no later than the 10th day of each month in respect to all employment during the preceding month on which contributions were payable. Benefit contributions shall be sent to the IATSE Training Trust Fund, P.O. Box 51317, Los Angeles, CA 91602.

15.014   The Employer agrees to be bound by all of the terms and conditions of The Agreement and Declaration of Trust for each of the following Funds designated in Addendum A: (1) the IATSE Health and Welfare Fund, (2) the IATSE National Pension Fund, and (3) the IATSE National Annuity Fund,   all as restated September 22, 2005, as amended, respectively, and each respective Fund's Statement of Policy and Procedures for Collection of Contributions Payable by Employers, as related to the contributions due as set forth in this Agreement.

15.015   The Employer agrees to be bound by all of the terms and conditions of the IATSE Entertainment and Exhibition Industries Training Trust Fund Agreement, established June 22, 2011, ("Trust Agreement") and to abide by and be bound by any amendments thereto, and all policies and procedures of the Fund, including Collection of Contributions Payable by Employers, as related to the contributions due as set forth in this Agreement.

15.016   The Trustees of said Benefit Funds shall have the right through the accountant of their choice to examine the Employer's payroll and employment records to verify the information contained on the reporting forms, or to determine the amount owed in the event of late payments or default. Such audit shall be at the Fund's expense.

15.017   The Employer agrees to withhold voluntary wage assignments for the IATSE Annuity Fund and forward the assignments to the Annuity Fund in the same manner that Employer contributions are made. Employees must submit their request for voluntary wage assignment on the proper form provided by the IATSE Annuity Fund.

## ARTICLE 16 - WAGE RATES

16.01    The minimum wage scales shall be as follows:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| Steward | 24.82 | 25.94 | 26.72 | 27.52 | 28.35 |
| Lead | 24.21 | 25.30 | 26.06 | 26.84 | 27.65 |
| Journeyman | 22.99 | 24.04 | 24.79 | 25.54 | 26.29 |
| Helper | 17.18 | 17.98 | 18.53 | 19.08 | 19.63 |
| New Hire | 14.86 | 15.60 | 16.23 | 16.71 | 17.22 |
| Carpet Team | 19.05 | 19.91 | 20.51 | 21.13 | 21.76 |

16.011   The Union may redistribute wages into the Health & Welfare Fund contribution at any time during the term of this Agreement upon sixty days written notice to the Employer.

16.012   Priority employees shall be paid at the Lead rate.

16.013   Over scale employees shall receive the same percentage wage increases given to Journeymen.

16.02    All aerial lift operator work, and lift work performed twenty (20) feet or above, will be paid at the Lead rate and may be reassigned to other work, but shall not have their pay reduced for the remainder of the day.

16.03    All time worked shall be in one-half (1/2) hour increments.

16.04    The Company's Payroll week shall run from Monday to Sunday. The Company shall offer direct deposit to employees.

16.041   The Company shall deduct the appropriate FICA and Federal Income Tax from each paycheck, as well as make the appropriate contributions and payments required of a responsible employer. The Company will provide Worker's Compensation coverage and will show proof of such as required by State Law.

16.042   Payroll checks will be forwarded to the Office of the Local Union no later than Friday of each week for distribution to the individual workers. Employees must be paid no later than seven (7) working days from the end of the pay week.

16.05    If an employee believes that their pay is in error, they will promptly notify the payroll department of the Company or their Local Union office. The Company shall either verify the error or deny the claim within five (5) days of receipt of the claim. If the claim is verified, the pay correction shall be distributed on the regular payday for the week in which the error was verified. Failure to pay within this time frame shall subject the employer to a pay penalty of one (1) hour straight time pay for each regular workday (Monday through Friday) the correction check is delayed beyond the required payment.

## ARTICLE 17 - SAFETY

17.01   The Employer and the Union shall work together to insure that all applicable safety rules as set forth by the Occupational Safety and Health Act are followed. Employees shall be expected to follow the safety rules issued by the Employer. The Employer shall provide a copy of its rules to each employee and the Union.

17.02   For all employees covered by this Agreement, the Employer shall carry Worker's Compensation Insurance in accordance with State law.

17.021  The Employer shall supply fall protection safety harnesses for use in overhead rigging and shall be responsible to ensure its adequacy, including proper maintenance of such equipment. With the Employer's approval, employees may provide their own protective equipment which will be subject to inspection.

17.03   Employees will not be required to work under conditions that are in violation of the Occupational Safety and Health Act standards.

17.04   All accidents or injuries must be reported immediately to management.

17.05   All footwear worn by referrals must provide adequate protection from injury. Shoes should have stiff leather uppers; sandals, thongs and the like are strictly prohibited.

17.06   Employees found to be in violation of safety rules shall be subject to disciplinary action.

17.07   All employees must be able, for safety purposes, to understand the employers oral and written instructions and directions.

## ARTICLE 18 - ATTIRE

18.01   The Employer has the right to reject or discharge any employee who fails to meet a dress code consisting of the following guidelines:

18.011  All Union Referrals will report to work wearing neat and clean clothing. Short pants and sleeveless and/or collarless shirts (Local Union, I.A., Company T-Shirts excluded) workout pants, tights and leotards are prohibited. Additionally, any shirts, caps or other apparel containing lewd, vulgar, or any offensive message is prohibited. Shorts are not permitted on stand-by (show dates).

18.012  Short pants, and/or collarless shirts will be permitted on move-in and move-out days in all areas that are not air conditioned.

18.013  Bargaining unit employees are not to wear clothing or identification of an employer who is not their present employer.

18.014    Knee length shorts are permitted at the Convention Center on move-in and move-out days only. Show opening and closing days, as well as all other show days are excluded. Knee length shorts must be neat and pose no safety problems. The Union will assist the Company in the enforcement of this code.

18.015    Sunglasses shall not be worn indoors.

18.02    Any Referral rejected or discharged due to a dress code violation will not be eligible to work for the remainder of that call but is eligible for the next call provided dress code standards are met.

18.03    Dress code for venues other than the Convention Center shall be dictated by the venue requirements.

## ARTICLE 19 - MISCELLANEOUS

19.01    The Company has established a clearly defined and openly communicated Drug and Alcohol Policy in order to help provide for the safety and security of employees and others affected by its operations. This Policy and Program will be incorporated into this Agreement. See Addendum A.

19.02    In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction, or through government regulations or decrees, such decision shall not invalidate the entire Agreement, it being the express intention of the parties hereto that all other provisions not declared shall remain in full force and effect.

19.03    The parties hereto acknowledge that during the course of negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects to collective bargaining and that all such subjects have been discussed and negotiated upon and the agreements contained herein were arrived at after the free exercise of such rights and opportunities. Therefore, the Company and the Union, for the term of this Agreement, each voluntarily and unqualifiedly waives the rights, and each agrees that the other shall not be obligated, to bargain collectively with respect to any subject or matter so specifically referred to or covered by this Agreement, even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

19.04    All matters between the Company and the Union regarding wages, hours, and conditions of employment, shall be governed only by the provisions of this Agreement. The parties agree to be bound only by the express written provisions of this Agreement regardless of any previous written or oral understanding and/or proceedings that may have existed prior to this Agreement.

19.05    The Business Agent or their duly appointed representative shall be permitted access by the Company to any work location at any time so long as: (a) The Union complies with any applicable security requirements and procedures; and (b) There is no disruption or interference with work or a public display.

19.06  As the Union is a member of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Technicians, Artists and Allied Crafts of the United States and Canada, nothing in this Agreement shall ever be construed to interfere with any obligation the Union owes to such International Alliance by reason of obligation; but this shall in no way be construed so as to conflict with any applicable State or Federal laws. Should any clause herein be so construed, it shall not in any way invalidate any other clause herein.

19.07  In cases of repeal or amendment of the Labor Management Relations Act of 1947 or in case of new legislation rendering permissible any union security to the Union greater than those specified in this Agreement, then and in such event the provisions shall be discussed by the undersigned parties.

19.08  If the International Union or any other Local Union signatory to this Agreement makes an arrangement or executes a Collective Bargaining Agreement with a General Service Contractor where such arrangement, agreement, or agreements are for the performance of same or similar work, and where they contain wages, fringe benefits or working conditions substantially more favorable to a General Service Contractor or General Service Contractor Bargaining Group than those contained in this Agreement, then upon written notice to the Union and thereafter, the wages, fringe benefits and working conditions in the more favorable agreement will be part of this Agreement.

19.09  Rolling of aisle carpeting at the close of a show is not limited solely to those workers covered under this Agreement.

# ARTICLE 20 - DURATION

20.01   This Agreement, including Addendums A and B, shall take effect as of October 1, 2018 and shall remain in full force and effect until October 1, 2023, herein called the Expiration Date, and from year to year thereafter; unless by written notice given at least thirty (30) days prior to the Expiration Date either party notifies the other of its desire to amend or terminate the Agreement by written notice mailed to the Employer at its local address or to the Union at its local office(s). If the parties are unable to agree upon the proposed amendment, or amendments, on or before the Expiration Date or within such extended time as may be mutually agreed on, the Contract shall then expire. This contract is complete in itself and sets forth all the terms and conditions of the Agreement between the parties hereto.

For the Company:

_____, SVP
Steve Moore
Senior Vice President

Date: MARCH 18, 2019

For the IATSE

_____
Joanne Sanders
International Vice-President

Date: March 14, 2019

For IATSE Local Unions 835, 60, 115, 321, and 412:

_____
Mark Hardter, Business Representative

Date: 3-14-19

## ADDENDUM A
## DRUG AND ALCOHOL TESTING POLICY

### SECTION 1: PROHIBITED ACTIVITY

1.  The use, possession, transportation or sale of intoxicating beverages, legal, or illegal drugs or paraphernalia by any employee while on duty, while on Company premises or in a Company vehicle, or while on any show site, is prohibited. The only exception shall be for properly reported prescription drugs prescribed by a licensed physician as medication for use by the person possessing such substance.

2.  Reporting to work under the influence of intoxicating beverages, or testing positive for drugs is prohibited.

### SECTION 2: ALCOHOL AND DRUG TEST

1. For alcohol tests: A blood alcohol test will be performed with a Blood Alcohol Concentration level (BAC) of .08%. Anyone who tests positive at .08% or above is considered intoxicated and will be in violation of this policy.

2. For drug tests: Two tests will be performed. First, an initial test (screen) will be performed. If this first test is positive (positive meaning the drug is in the employee's system at or above the cut-off value), then a second test will be performed (confirmation). The confirmatory test shall be different in technique and chemical principle from that of the initial test procedure. At this time, gas chromatography/mass spectrometry (GC/MS) is the best procedure and will therefore be used.

3. All tests will be paid for by the Company.

### SECTION 3: CUT-OFF LEVELS

The following cut-off levels shall be used when analyzing specimens to determine whether they are negative or positive for these drugs or classes of drugs:

| | (NG/ML) | | |
| --- | --- | --- | --- |
| Initial Test Analyte | Initial Test Cut-off Concentration | Confirmatory Analyte | Confirmatory Test Cut-off Concentration |
| Marijuana Metabolites (THCA) | 50 | THCA | 15 |
| Cocaine Metabolites (Benzoylecgonine) | 150 | Benzoylecgonine | 100 |
| Phencyclidine (PCP) | 25 | Phencyclidine (PCP) | 25 |

| **Amphetamine** | | Amphetamine | 250 |
|---|---|---|---|
| Amphetamine | 500 | Methamphetamine | 250 |
| Methamphetamine | 500 | MDMA/MDA | 250 |
| MDMA/MDA | 500 | | |
| **Opioids** | | Codeine/Morphine | 2,000 |
| Codeine/Morphine | 2,000 | 6-Acetylmorphine | 10 |
| 6-Acetylmorphine | 10 | (6AM or Heroin) | |
| (6AM or Heroin) | | Hydrocodone | 100 |
| Hydrocodone | 300 | Hydromorphone | 100 |
| Hydromorphone | 300 | Oxymorphone | 100 |
| Oxymorphone | 100 | Oxycodone | 100 |
| Oxycodone | 100 | | |

These test levels are subject to change due to recommendations by the US Department of Transportation as advances in technology or other considerations warrant identification of these substances at other concentrations. Testing and test levels are to comply with applicable State and Federal regulations. If these levels are changed, the Union will be notified of any such change(s).

## SECTION 4: CAUSE FOR TESTING

1. Any employee involved in a reportable accident or any employee who sustains a reportable injury while on the job will be required to cooperate in the taking of blood and urine samples to be used for drug and alcohol analysis. This includes but is not limited to all vehicle accidents, all injuries that require treatment beyond simple first aid, and any other damage to property with an estimated value of $500.00 or more.

2. Any employee showing signs of substance use will be required to cooperate in the taking of blood and urine samples to be used for drug and alcohol analysis.

3. Employees may be subject to random drug testing when such random testing is required by law.

## SECTION 5: DISCIPLINE

1. There are two (2) categories under which an employee will be disciplined:

A. When an accident or reportable injury occurs, and the employee is tested for substance abuse with positive results as confirmed by the lab; or

B. When an employee is observed drinking or using drugs or is found with evidence of such use while on duty, while on Company premises or in a Company vehicle, the following discipline will be administered:

1st Policy Violation: Suspension without pay for thirty (30) calendar days. Suspended employee must complete an approved rehabilitation program and sign a conditional Reinstatement Agreement in order to return to work.

2nd Policy Violation: Dismissal

C. Employees have the right to refuse to cooperate in the requested tests; however, refusal to cooperate in such lawfully submitted tests by an employee will result in the same consequences as if the employee had tested positive as confirmed by the lab.

## SECTION 6: PAY STATUS

Any employee who is required to take the Drug and Alcohol Test due to being involved in a reportable accident or injury will be allowed to return to work, unless management suspects the accident or injury was drug or alcohol related. In such a case, the employee would be temporarily suspended until the Company received the test results. The employee will be paid for any scheduled work time missed for a drug and alcohol test due to accident or injury, if the test is negative.

**ADDENDUM B**

It is mutually agreed and understood between the Employer, and the IATSE and its Locals 60, 115, 321, 412, and 647 collectively referred to as the Union, that notwithstanding the provisions of the collective bargaining agreement in effect between the parties, the following modifications shall be in effect in the respective areas.

### Article 2 - Scope of Agreement

2.01    Add forklift, scissorlift and snorkle operation.

Forklift drivers will be provided by the Union. Forklift drivers shall be paid at the Lead rate. The Union shall provide the Employer with a list of qualified operators to be updated on an annual basis.

Heavy equipment operation will be at the discretion of the Employer.

All on-site freight and loading will be handled by the Union in Jacksonville and Tampa, provided the Union can fill the call, and provide the Employer in advance with the call list.

### Article 10 - JCTC

10.04 through 10.06    In the spirit of these sections, the Employer with the help of the above Locals will participate in a concentrated training program to be presented within the jurisdiction of these Locals. There will be a minimum of one two-day training session per year based on the training curriculum formatted by the JCTC.

### Article 11 - Work Referral System

11.021    Change 1,000 hours to 500 hours.

11.022    Change 500 hours to 250 hours.

11.023    Delete second sentence.

11.03    All calls will be filled by each local in accordance with the terms of each local's job referral procedure.

11.09    The Company will make every reasonable effort to provide a minimum notice of ninety-six (96) hours for all show calls. The Union will provide the Company with a copy of the call list twenty-four (24) hours prior to the call time for all calls with a ninety-six (96) hour notice. If, due to unforeseen circumstances, the Union is unable to fill a labor call, the Company will be free to seek alternate sources of labor from whatever source necessary to complete the call. The Company will only source replacement labor in a number equal to or less than the number of employees the Union is unable to provide.

### Article 13 - Working Conditions

13.02    There shall be one fifteen (15) minute break approximately every two (2) hours, except that there shall be only one (1) fifteen (15) minute break between meal periods.

13.03    A worker shall receive an unpaid meal period of one (1) hour to begin after the end of the third (3rd) and prior to the start of the sixth (6th) hour after starting work. After returning to work, a worker shall receive a meal period of one (1) hour for each four (4) or five (5) continuous hours thereafter. A worker who does not receive a meal period after five (5) continuous hours of work will be subject to further provisions outlined in this Article. A worker who is held for work after the meal period shall be guaranteed two (2) additional hours of work. If the meal period is taken after the third (3rd) hour a three (3) hour minimum does apply after that break. The Company shall have the option to elect to omit a subsequent meal period in which case the worker will work six (6) more hours and then be dismissed from the call. If the worker is held after the six (6) hour period, meal penalty provisions will apply as outlined.

13.031   If an employee works six (6) hours without a meal break and is released from duty, then the employee shall receive a fifteen minute break at the beginning of the second and fourth hours and a meal penalty shall not be paid. However, if an employee works past the sixth (6th) hour, the meal penalty shall be paid retroactive to the fifth hour.

13.032   Upon mutual agreement between the Job Steward and the Employer, the one hour unpaid meal break as provided for in the above may be reduced to a one-half hour paid meal break.

Article 16 - Wage Rates

16.01    The rigging rates outside of the Orlando area shall be as follows:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| | 27.93 | 29.19 | 30.06 | 30.96 | 31.89 |

16.011   Riggers may be reassigned to other work depending on the Employer's needs but shall not have their pay rate reduced for the remainder of the day.

19.09    The provisions of this Article are not applicable outside of the Orlando Local 835 jurisdiction.

**Jacksonville Local 115 Only**

There shall be one hour of applicable straight time rate paid travel time for each 30 mile increment to and from any work place that is more than 30 miles from downtown Jacksonville for each call. This amount shall have no bearing on the start of overtime rates.

All other terms and conditions in the collective bargaining agreement in effect between the parties that are not mentioned above shall remain in full force and effect.

10.04   Training:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| Journeyman | .3% | .3% | .3% | .3% | .3% |
| Helper | .4% | .4% | .4% | .4% | .4% |
| New Hire | .4% | .4% | .4% | .4% | .4% |
| IATSE Training | .5% | .5% | .5% | .5% | .5% |

15.01   Benefits:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| H&W | 22.7% | 22.7% | 22.7% | 22.7% | 22.7% |
| Pension | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Annuity | 2.6% | 2.6% | 2.6% | 2.6% | 2.6% |

16.01   Wages:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| Steward | 25.48 | 26.63 | 27.43 | 28.25 | 29.10 |
| Lead | 24.87 | 25.99 | 26.77 | 27.58 | 28.40 |
| Journeyman | 23.66 | 24.72 | 25.46 | 26.23 | 27.01 |
| Helper | 17.35 | 18.13 | 18.67 | 19.23 | 19.81 |
| New Hire | 14.92 | 15.66 | 16.28 | 16.77 | 17.27 |

**Tampa Local 321 Only**

10.04   Training:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| Journeyman | .3% | .3% | .3% | .3% | .3% |
| Helper | .4% | .4% | .4% | .4% | .4% |
| New Hire | .4% | .4% | .4% | .4% | .4% |
| IATSE Training | .5% | .5% | .5% | .5% | .5% |

15.01    Benefits:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| H&W | 16.4% | 16.4% | 16.4% | 16.4% | 16.4% |
| Pension | 3.6% | 3.6% | 3.6% | 3.6% | 3.6% |
| Annuity | 5.8% | 5.8% | 5.8% | 5.8% | 5.8% |

16.01    Wages:

| Effective: | 10/1/18 | 10/1/19 | 10/1/20 | 10/1/21 | 10/1/22 |
|---|---|---|---|---|---|
| Steward | 26.10 | 27.27 | 28.08 | 28.92 | 29.79 |
| Lead | 25.48 | 26.63 | 27.43 | 28.25 | 29.10 |
| Journeyman | 24.27 | 25.36 | 26.12 | 26.90 | 27.71 |
| Helper | 17.35 | 18.13 | 18.67 | 19.23 | 19.80 |
| New Hire | 14.91 | 15.65 | 16.28 | 16.77 | 17.27 |

## Memorandum of Agreement
### *between*
### Global Experience Specialists (GES)
### *and*
### IATSE and its Local 835
### Orlando, FL

Employees of Global Experience Specialists, Inc. ("GES") – Orlando offered the opportunity to travel to work at locations outside the areas covered by the collective bargaining agreements between GES and IATSE Local 835 on an "as needed basis" shall receive the following:

- Pay at the employee's then current local Orlando straight time rate of pay (which straight time rate may be "overscale").

- Contributions to the following Funds, at the then current rates (as applicable):

  - IATSE National Health and Welfare Fund
  - IATSE National Pension Fund
  - IATSE Annuity Fund
  - IATSE Entertainment and Exhibition Industries Training Fund
  - IATSE Local 835 Training Fund

- Dues Check-off and PAC Check-Off to the extent a written authorization has otherwise been received and is in compliance with Federal and State law.

- Employees shall receive eight (8) hours minimum pay at prevailing rate on work days.

- Employees shall receive four (4) hours minimum straight time pay on days they are not assigned work by GES while on location.

- Overtime pay may increase at the Employer's discretion but at no time shall it be less than is provided under the collective bargaining agreements referenced above.

- Travel time will be paid as follows:

  - Travel time will be paid from the time an employee leaves his/her home to the time he/she reaches the hotel or other destination in the hosting city, subject to a four (4) hour minimum at the prevailing rate if they do not work on the day of travel. If they work on the day of travel, there is no minimum for travel time. Travel time is considered hours worked for purposes of computing over-time.

  - Employees will be compensated for all travel related expenses as defined by the Viad Travel Policy.

The Viad Travel Policy is available to all employees upon request.

GES retains the right to offer such work in its absolute discretion and to discontinue traveling at any time.

The terms of this memo of agreement are enforceable through the dispute resolution procedures in the above referenced collective bargaining agreement, provided that no other terms and conditions of the collective bargaining agreements apply.

This memo of agreement will be in full force in conjunction with the durations of the above referenced agreements.

For the Employer:

_Steve Moore, SVP_
Steve Moore,
Senior Vice President

Date: _MARCH 18, 2019_

For IATSE Local 835:

_Mark R Hardter_
Mark Hardter,
Business Representative

Date: _2-21-19_

For IATSE:

_Joanne M Sanders_
Joanne M. Sanders
International Representative

Date: _February 21, 2019_